# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.:  1:11-CR-00997-DAB |
| | ) | |
| SCOTT ALLEN, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM
## AND MOTION FOR DOWNWARD VARIANCE
## ON BEHALF OF THE DEFENDANT SCOTT ALLEN

Prepared by:
Brian F. McEvoy
Georgia Bar No. 490845
Attorney for Defendant, Scott Allen

CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
3127 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 233-4171
(404) 261-2842 (Fax)
*bfm@cclblaw.com*

# **Table of Contents**

I.   PRELIMINARY STATEMENT .............................................................................. 1

II.   THE GUIDELINES CALCULATION OVERSTATES THE SERIOUSNESS OF THE
OFFENSE AND THUS SHOULD BE ACCORDED LITTLE TO NO WEIGHT IN
FASHIONING A SENTENCE NOT GREATER THAN NECESSARY TO ACHIEVE THE
PURPOSES OF SENTENCING.............................................................................. 3

III.   A NON-CUSTODIAL SENTENCE OF PROBATION, INCLUDING A PERIOD OF
HOME CONFINEMENT, WITH NO TERM OF IMPRISONMENT, WOULD BE
SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SATISFY THE GOALS OF
SENTENCING SET FORTH IN 18 U.S.C. § 3553(a) ............................................ 6

   A.   Mr. Allen's History and Characteristics Support a More Lenient Sentence .................. 9

     1.   Personal and Family Characteristics............................................................ 9

     2.   Cooperation with Government ................................................................... 11

   B.   A Custodial Sentence is Not Necessary to Provide Just Punishment, Deter Future
Criminal Conduct, or Protect the Public from Further Crimes of the Defendant .................... 14

     1.   The Need for Just Punishment.................................................................... 14

     2.   The Need for Deterrence; to Protect the Public from Future Crimes; and to Promote
Respect for the Law ........................................................................................ 16

   C.   A Guidelines Sentence Would Create Unwarranted Disparities in Sentences Imposed on
Similarly Situated Defendants Guilty of Similar Conduct ........................................ 19

IV.   CONCLUSION ................................................................................................. 24

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.:  1:11-CR-00997-DAB |
| | ) | |
| SCOTT ALLEN, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM**
**AND MOTION FOR DOWNWARD VARIANCE**
**ON BEHALF OF THE DEFENDANT SCOTT ALLEN**

COMES NOW Scott Allen, by and through his undersigned counsel, and respectfully submits this Sentencing Memorandum to assist the Court in the determination of an appropriate sentence following his plea of guilty to a Criminal Indictment charging him with conspiracy to commit securities fraud and substantive securities fraud.  The Presentence Report ("PSR") concludes that the applicable Sentencing Guidelines range in this case is 46-57 months' imprisonment.  For the reasons set forth below, we respectfully submit that a sentence within this range is far greater than necessary to achieve the statutory goals of sentencing as set forth in 18 U.S.C. § 3553(a) and request that this Court impose a non-Guidelines sentence which does not include a period of incarceration.

**I.     PRELIMINARY STATEMENT**

On March 19, 2012, Mr. Allen pleaded guilty, pursuant to a written plea agreement, to a Criminal Indictment charging him with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and seven substantive securities fraud counts, all in violation of 15 U.S.C. §§ 78j(b) and 78ff.  The plea agreement contains a stipulated Guidelines calculation of

1

46-57 months' imprisonment, based upon an offense level of 23 and a Criminal History of I.[1]
However, the plea agreement expressly reserves to Mr. Allen the right to argue for a sentence
outside of the stipulated Guidelines range pursuant to 18 U.S.C. § 3553(a).

Since pleading guilty, Mr. Allen has cooperated extensively with and has provided
substantial assistance to the Government both in this case as well as in another ongoing federal
criminal case.  Specifically, information Mr. Allen has provided to federal authorities has led to
(1) the application of an obstruction enhancement against a co-defendant in this case and (2) the
opening in the Northern District of Georgia of an entirely separate federal law enforcement
investigation into suspected criminal activity by the former Chief Financial Officer of Mr.
Allen's current employer.

In addition to Mr. Allen's extensive cooperation, several other factors, including, inter
alia, (1) that the Guidelines overstate the seriousness of Mr. Allen's offense; (2) the totality of
Mr. Allen's life and character; (3) Mr. Allen's extremely low risk of recidivism; (4) the
consistent imposition of below-Guidelines sentences for similarly situated defendants in this
district; and (5) punishment already incurred from reputational damage and loss of professional
career, all weigh in favor of a below-Guidelines, non-custodial sentence in this case.  On behalf
of Mr. Allen, we respectfully suggest that a sentence of a significant period of home
confinement, community service, and probation, in lieu of a term of imprisonment, would serve

---

[1] The Probation Officer applied a 16-level increase to Mr. Allen's base offense level of 8, pursuant to
U.S.S.G. § 2B1.1(b)(1)(J), based upon an intended loss amount of between $1,000,000 and $2,500,000.
This is so even though Allen gained approximately $100,000 as a result of the insider trading scheme.
The Probation Officer further applied a 2-level increase pursuant to U.S.S.G. § 3B1.3 after finding that
Mr. Allen abused a position of public or private trust, resulting in an adjusted offense level of 26.  Mr.
Allen received a 3-level reduction pursuant to U.S.S.G. § 3E1.1(a) and (b) based on his acceptance of
responsibility, yielding a total offense level of 23.

the goals of sentencing, and would constitute meaningful punishment, while at the same time permitting Mr. Allen to continue to provide for his wife and two young children.[2]

## II.      THE GUIDELINES CALCULATION OVERSTATES THE SERIOUSNESS OF THE OFFENSE AND THUS SHOULD BE ACCORDED LITTLE TO NO WEIGHT IN FASHIONING A SENTENCE NOT GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF SENTENCING

The Sentencing Guidelines range of 46-57 months, which is based primarily on a calculated loss or intended loss amount of between $1,000,000 and $2,500,000, grossly overstates the seriousness of the offense and Mr. Allen's culpability and bears no connection to Mr. Allen's actual conduct, the facts of this case, the aberrational nature of Mr. Allen's misconduct, or the otherwise commendable character Mr. Allen has demonstrated throughout his adult life.

As this Court knows, the Guidelines analysis for white collar crimes is driven almost entirely by the loss or intended loss amount.  Although loss "is often the single most important factor in the application of the Sentencing Guidelines," it "results in widely unwarranted sentencing disparity and a lack of certainty in sentencing, and produces sentences grossly disproportional to the actual seriousness of the offense."  Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); see also United States v. Ovid, 2010 WL 3940724, *1 (E.D.N.Y. 2012) (noting

---

[2] Probationary sentences in lieu of imprisonment were approved of by the Supreme Court in Gall, where the Court noted that while "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,]  [o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty."  128 S. Ct. at 595.  Due to the substantial restrictions on a defendant's liberty, "[p]robation is not granted out of a spirit of leniency," and "is not merely 'letting' an offender off early."  Id. at n.4 (quotation marks and citation omitted).

that fraud guideline [U.S.S.G. § 2B1.1], despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences").

In this case, the calculated loss amount represents the gain to John Bennett, the tippee, and other investors, rather than to Mr. Allen himself, who realized only a small fraction of that amount and did not himself trade on or directly profit from Bennett's trades. Nevertheless, the loss amount, based on the gain to Bennett, resulted in a 16-level increase in Mr. Allen's base offense level, which is the difference between a sentencing range of 0-6 months and 51-63 months. Indeed, the offense level assigned to Mr. Allen overstates the seriousness of his involvement in the offense. Although the Guidelines analysis measures Mr. Allen's culpability based on gain, the amount of gain in a case like this, where there are no identifiable victims, bears no reflection upon the amount of harm inflicted by the offense, or the defendant's actual conduct or culpability.

In United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), the defendant was convicted by a jury of conspiracy, securities fraud, and the three counts of causing false reports to be filed with the U.S. Securities and Exchange Commission. 441 F. Supp. 2d at 507. At his sentencing, the Government argued that the Sentencing Guidelines, if properly calculated, resulted in a total offense level of 55, which called for a sentence of life imprisonment, limited only by the maximum of 85 years permitted under the counts of which Adelson was convicted, and urged the Court to impose a sentence of at least 15 to 30 years' imprisonment. Id. at 507, 509. The Court noted that the Government's calculation was "rather remarkable in itself," since the highest offense level listed on the official Sentencing Guidelines Table was 43, and everything above level 42 resulted in "life imprisonment." Id. at 509. The Court ultimately

4

imposed a non-Guidelines sentence of 42 months imprisonment plus three years of supervised release.  In imposing sentence, the Court noted first "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." Id. at 512.  The Court then noted that, "confronted with an absurd guideline result" that was "wildly off-base," its only choice was to "focus its primary attention on the non-guidelines factors set forth in § 3553(a), including both those of general applicability and those that had special relevance to Adelson's particular circumstances." Id. at 512, 515.  After careful consideration of those factors, the Court arrived at a sentence that was well below what the Guidelines indicated.

Similarly, in United States v. Ovid, 2010 WL 3940724 (E.D.N.Y. 2010), the defendant, who had pleaded guilty to conspiracy to commit securities fraud and securities fraud in relation to two hedge funds, faced an advisory Guidelines range of 210 – 262 months, based on a total offense level of 37 and a Criminal History Category I.  Although Ovid's base offense level was 6, he received, among other enhancements, an additional 20 levels based on the loss amount alone, which was calculated at over $7 million.[3]  In sentencing Ovid to a 60-month term of imprisonment, which was twelve and one-half years less than the low end of the advisory Guidelines range of 210–262 months, the Court analyzed a host of other, non-Guidelines factors that were "properly considered pursuant to 18 U.S.C § 3553(a), [but]  not adequately accounted for in the Guidelines themselves." Id. at *6.   The Court observed that "consideration of … the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the

---

[3] Ovid also received four levels for more than 50 victims, four levels for being associated with a registered broker, two levels for preying on vulnerable victims, and four levels for his leadership role in the offense.  He received a three-level reduction for acceptance of responsibility based on his early guilty plea. Id. at *3.

goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range." Id. at *1.

In sum, while "the Guidelines should be the starting point and the initial benchmark[,] [they] are not the only consideration," Gall v. United States, 552 U.S. 38, 49, 128 S. Ct. 586, 596 (2007), and must be considered "together with the other factors set forth in 18 U.S.C. § 3553(a) by judges fashioning sentences." United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006). Indeed, in fraud cases such as this one, careful consideration of the § 3553(a) factors is even more crucial in order to avoid the imposition of unreasonably harsh sentences. See Ellis, et al., 25 Crim. Just. at 37 (observing that the "fraud guideline," U.S.S.G. § 2B1.1, "focuses primarily on aggregate monetary loss and victimization [and] fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case").

## III.   A NON-CUSTODIAL SENTENCE OF PROBATION, INCLUDING A PERIOD OF HOME CONFINEMENT, WITH NO TERM OF IMPRISONMENT, WOULD BE SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SATISFY THE GOALS OF SENTENCING SET FORTH IN 18 U.S.C. § 3553(a)

A substantial variance from the stipulated advisory Guidelines range of 46 to 57 months' imprisonment is necessary in this case because that range: (1) fails to take into account, *inter alia*, Mr. Allen's history and personal characteristics; low risk of recidivism, cooperation with the Government, charitable works, genuine remorse, and other employment factors; (2) would result in unwarranted disparities as compared with sentences for similarly situated defendants; and (3) is far greater than necessary to promote the statutory goals of sentencing.

In sentencing a criminal defendant, the Court must first calculate the correct guidelines range. See United States  v. Cavera, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). Once the Court

has properly calculated the Guidelines range, it must determine whether a sentence within that range is "sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. 3553(a)(2)," which are the need for the sentence imposed –

     (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)    to afford adequate deterrence to criminal conduct;

     (C)    to protect the public from further crimes of the defendant; and

     (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts, in determining a minimally sufficient sentence, to consider, in addition to theses statutory purposes, the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a)(1)-(7).  Under United States v. Booker, 543 U.S. 220 (2005) and, more recently, Gall, sentencing courts must give due consideration to *all* of the factors set forth in 18 U.S.C. § 3553 – not merely the Guidelines, which are but one such factor – in fashioning a reasonable sentence.  In doing so, the court must "examine the record as a whole to determine whether a sentence is reasonable in a specific case"; a Guidelines sentence, without more, is not considered "presumptively" reasonable.  Fernandez, 443 F.3d at 27 (quotation marks and citations omitted).  Indeed, the district court is "free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines."  Kimbrough v. United States, 552 U.S. 85, 112 (2007) (Scalia, J., concurring).  See also Cavera,

7

550 F.3d at 189 (stating that because the Guidelines are advisory only, district Courts are "generally free to impose sentences outside the recommended range"); Ovid, 2010 WL 3940724 at *1 ("[C]onsideration of … the … factors set forth in § 3553(a)" may produce fair sentences that "can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider").

Accordingly, if the court finds, based on due consideration of the § 3553(a) factors, that a sentence within the Guidelines range does not adequately serve the purposes of sentencing as set forth in the statute, it must select a sentence that does.   See Nelson v. United States, 555 U.S. 350, 351, 129 S. Ct. 890, 891-92 (2009) ("[T]he sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)."); see also Fernandez, 443 F.3d at 34, n.11 (holding it was not error for sentencing court "to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted lightening of, or fashioning of an alteration to, the advisory Guidelines sentence (or, in other words, imposing a non-Guidelines sentence)" (quotation marks, alterations, and citations omitted)); United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005), abrogated on other grounds by United States v. Lake, 419 F.3d 111 (2d Cir. 2005) ("[T]he sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether … to impose a non-Guidelines sentence.").   "[I]t does not undermine the Sentencing Guidelines at all, much less create some kind of rogue sentencing regime, when the consideration of factors set forth in 18 U.S.C § 3553(a) produces a sentence that happens to be substantially below the advisory range." Ovid, 2010 WL 3940724, *2.

When all of the 3553(a) factors are considered in this case, it becomes clear that lightening of the advisory Guidelines sentence is warranted.  Mr. Allen respectfully submits that an evaluation of the Section 3553(a) factors supports a sentence that does not include a term of imprisonment, but, rather, involves community confinement or home detention for a meaningful term of months, if necessary.

**A.     Mr. Allen's History and Characteristics Support a More Lenient Sentence**

There is no question that Mr. Allen violated the law and that he knew his conduct was wrong when he engaged in it.  Without minimizing or making excuses for such a grave lapse in judgment, we urge this Court to view his criminal conduct in the context of the totality of Mr. Allen's life and character.  Adelson, 441 F. Supp. 2d at 513-14 (stating, in sentencing defendant well below the applicable Guidelines range, that "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance").  "This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed Courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"  Id.

*1.     Personal and Family Characteristics*

Mr. Allen was a law-abiding citizen with no criminal history and exemplary character before he committed the instant offense.  He was and still is hardworking; highly involved in his community as a member of his local church; a volunteer and fundraiser for the American Cancer Society, Relay For Life, the American Red Cross, and various homeless shelters; and, perhaps

most importantly, a loving and devoted husband to his wife, Gaylin, and father to his two young

children, Haley, age 11, and Nick, age 9.  Mr. Allen is extremely close with his children and is

an active participant in their day-to-day lives.  He has always worked hard to provide for his

family, for whom he is the sole source of income, as Mrs. Allen has no formal education or work

experience and will be unable to support their family if Mr. Allen is incarcerated.

       As noted, Mr. Allen is currently employed at Brightlink Communications ("Brightlink"),

where he provides accounting services.  Although the company is aware of Mr. Allen's

involvement in this case, it nevertheless has offered him a full-time position.  In his letter to the

Court, Lance Weller, President of Brightlink, indicates that Brightlink "[w]ill be tremendously

disadvantaged if [Mr. Allen] is unable to continue to make the extraordinary contributions he

adds to our company."  (Exh. A-18).  Any term of imprisonment imposed on Mr. Allen will

greatly affect his family by making him unable to provide for his two children.  Such a result

would be disproportionately severe given the isolated nature of the conduct in this case.

       In addition to the support of his family and employer, Mr. Allen also has the support of

extended family, numerous lifelong friends, and neighbors, twenty-two of whom have taken the

time and effort to write letters to the Court (attached hereto as Exhibit A) and express their views

of Mr. Allen as a man who, notwithstanding the serious failure in judgment that led to his

criminal conduct in this case, has demonstrated commendable character in his community.  As

these individuals attest in their letters, Mr. Allen's generosity and devotion do not end with his

own family.  Mr. Allen, who is affectionately known by many of his friends' children simply as

"Uncle Scotty," has opened his home to his neighbors and friends, and has served as a role

model for their children.  In one touching letter from his neighbor, Mrs. Kelly McCluskey, she

recalls Mr. Allen's acts of compassion while she was undergoing chemotherapy for breast cancer.  In addition to the moral support Mr. and Mrs. Allen offered to the McCluskeys during this difficult time, it was Mr. Allen's efforts to bring comfort and distraction to the McCluskey children while their mother was being treated that made the greatest impression upon Mrs. McCluskey.  These letters make clear that Mr. Allen is a positive force in his community, and that his absence should he be incarcerated would negatively impact not only his family but his community as well.  By way of example, Mr. Allen's elderly mother, Patricia Wolfgram, expressed her concern by writing, "I don't know how much time I have left in this world but I lie awake every night afraid that my son will be taken away and I will never see him again before I pass."

In short, Mr. Allen is a devoted father and loving husband, a dedicated professional, and a compassionate friend, who has, notwithstanding the instant offense, lived a virtuous and blemish-free life.  When viewed in the context of his entire adult life, it becomes clear that Mr. Allen's conduct in this case was completely uncharacteristic.  The integrity, good character, and generous acts for which Mr. Allen has come to be known by his family, friends, neighbors, and colleagues fully support the non-custodial sentence requested in this case.

  2.    *Cooperation with Government*

The Second Circuit has held that "in formulating a reasonable sentence a sentencing judge must consider 'the history and characteristics of the defendant' within the meaning of 18 U.S.C. § 3553(a)(1), as well as the other factors enumerated in § 3553(a), *and should take under advisement any related arguments, including the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure*

*pursuant to U.S.S.G. § 5K1.1*." Fernandez, 443 F.3d at 33 (emphasis added).  In so holding, the Court reasoned that because "[s]ection 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant[,] [t]his sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation." Id. See also Crosby, 397 F.3d at 113 (stating that in determining whether a non-Guidelines sentence is appropriate, "the sentencing judge is entitled to find *all* the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence" (emphasis added)).

As noted, Mr. Allen is currently providing assistance to the Government in the Northern District of Georgia in connection with a federal investigation into criminal activity by Clive Marsh, the former Chief Financial Officer of Brightlink Communications, LLC ("Brightlink"), located in Atlanta, Georgia, where Mr. Allen has been employed since January 2012.  Mr. Allen discovered in May 2012 that Mr. Marsh appeared to be conducting a large-scale scheme to, *inter alia*, embezzle company funds.  Mr. Allen immediately informed his superiors at Brightlink of his discovery of Mr. Marsh's illegal activities.  As a result, Mr. Allen impounded Mr. Marsh's company laptop, directed that a wheel clamp, or "boot," was affixed to Mr. Marsh's automobile, and oversaw a search from which evidence of Mr. Marsh's wrongdoing was seized; all other records of Mr. Marsh's wrongdoing that could be located within the Brightlink offices were seized; and Mr. Marsh was escorted from the company offices by Mr. Allen.

In the first week of June 2012, Mr. Allen contacted the Federal Bureau of Investigation's ("FBI") office in the Northern District of Georgia in Atlanta, Georgia to report his discovery of Mr. Marsh's apparent criminal activity.  Mr. Allen spoke directly with the FBI's main desk,

while undersigned counsel spoke with FBI Special Agent William A. Cromer (the agent involved in the instant criminal case). Within a week, Mr. Allen met in person with FBI Special Agent William E. Share to give a comprehensive statement of his discovery of Mr. Marsh's criminal activity and the actions that he took upon this discovery. Mr. Allen also provided the evidentiary items discussed above to Special Agent Share.

Throughout June and July 2012, Mr. Allen has repeatedly met in person, communicated via email, and spoken over the phone with Special Agent William E. Share to provide information to the Government in furtherance of its investigation. Several of the emails that were exchanged between Mr. Allen and Special Agent Share are attached hereto as Exhibit B. Specifically, Mr. Allen has had between five (5) and ten (10) telephone communications with Special Agent Share every week for the last three weeks to exchange updates and facilitate the gathering of information in the Government's investigation of Mr. Marsh. Additionally, Mr. Allen has, at the FBI's direction, attempted to record numerous telephone calls with Mr. Marsh and Mr. Allen has met in person with Special Agent Share on two separate occasions, once to host the successful recording of one conversation with Mr. Marsh, and another to coordinate the Government's surveillance of a proposed visit by Mr. Marsh to the Brightlink office in Atlanta. Despite Mr. Allen's considerable efforts to lure him back, Mr. Marsh did not return to the Brightlink offices. To Mr. Allen's knowledge, he was, at least initially, the exclusive source of the Government's information regarding these apparently criminal acts, and his actions led directly to the opening of this ongoing investigation of Mr. Marsh.

Mr. Allen has also cooperated in the instant case. Shortly after entering his guilty plea, Mr. Allen gave a proffer to the Assistant United States Attorney. See June 27, 2012 Letter from

AUSAs Levy and Tarlow to Brian McEvoy, attached hereto as Exhibit C.  During that proffer, he advised the Government of information which revealed that Lawrence Robbins, whom Bennett had sworn was not involved in the fraud and had no knowledge that Bennett was obtaining inside information from Mr. Allen, was in fact aware of and a participant in the conspiracy.  Id.  Armed with this information, the Government confronted Bennett, who thereupon admitted that Robbins was involved in the conspiracy between Bennett and Mr. Allen, that Robbins knew Mr. Allen was supplying Bennett with inside information, and that Bennett and Robbins had also conspired to obstruct justice by agreeing that Bennett would lie to the Government to conceal Robbins's participation in the conspiracy.   As a result of this new information, the Government has indicated that it will not seek a U.S.S.G. § 5K departure on Bennett's behalf, and will seek an obstruction of justice enhancement at his sentencing.  Id.

**B.    A Custodial Sentence is Not Necessary to Provide Just Punishment, Deter Future Criminal Conduct, or Protect the Public from Further Crimes of the Defendant**

>    *1.    The Need for Just Punishment*

Although Mr. Allen's conduct should not be excused, we respectfully submit that a sentence with no term of imprisonment will provide just punishment.  Indeed, Mr. Allen, who has been under the restrictions of federal pretrial release since September 21, 2011, already has been punished.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) ("[W]hen evaluating the justness of [the defendant's] punishment for the purposes of reaching a reasonable sentence under United States v. Booker, it is important to consider all other forms of punishment [the defendant] has already suffered.").

Mr. Allen has been disgraced within the community, will lose his professional credentials[4] and his ability to work in the actuarial industry as a result of this case.  These are important factors the Court should consider in deciding on an appropriate sentence.  See, Vigil, 476 F. Supp. 2d at 1235 (granting downward variance where defendant had "suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case and the case against his co-conspirators");  United States v. Gaind, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (downwardly departing from sentencing range where "destruction of the defendant's business ha[d] already achieved to a significant extent some although not all of the objectives otherwise required to be sought through the sentencing process").  Mr. Allen is acutely aware of the great pain he has already caused himself, his family, his friends, and his community, and, as punishment for his very serious, but momentary, lapse in judgment, he must, quite justifiably, forever wear the stigma of being a convicted felon.  The lasting and irrevocable impact of such a designation on Mr. Allen's character, reputation, and future ability to provide for his family is a more than significant deterrent.  The punishment Mr. Allen has already endured as a result of his conviction weighs in favor of a non-custodial sentence.

We also note that in committing the instant offense, Mr. Allen was not motivated by greed, and the purpose of the fraud was not to enrich Mr. Allen.  See Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) ("The defendant's motive for committing the offense is one important factor" in determining what sentence to impose on a convicted defendant).  Instead, Mr. Allen was driven by a desire, albeit a very misguided desire, to help an old friend who was down on his

---

[4]   It took Mr. Allen ten years to complete the difficult actuarial exams to gain his credentials that will now be forfeited.

luck.  This is certainly not an excuse for Mr. Allen's conduct, but is an important factor in

mitigation of the harsh sentence indicated by the Guidelines in this case.

Put simply, a sentence of incarceration is not necessary to justly punish Mr. Allen.

Indeed, the entry of a substantial criminal fine and restitution is often an equally, if not more

significant, form of retribution than prison time for financial offenses.  United States v. Adelson,

441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).  All that a term of incarceration will accomplish is

that Mr. Allen loses his job, will be unable to make restitution, be unable to pay any fine, and be

unable to provide for his family.  Given the punishment he already has received, a sentence

below the stipulated Guidelines range will fully vindicate the goals of 18 U.S.C. § 3553(a)(2).

2.    *The Need for Deterrence; to Protect the Public from Future Crimes; and to Promote Respect for the Law*

A sentence of incarceration also will not accomplish the goal of general or specific

deterrence.  See United States v. Yeaman, 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J.,

dissenting) ("It is widely recognized that the duration of incarceration provides little or no

general deterrence for white collar crimes"); see also Adelson, 441 F. Supp. 2d at 514 ("[T]here

is a considerable evidence that even relatively short sentences can have a strong deterrent effect

on prospective "white collar" offenders.").[5]  No additional punishment is necessary in this case

to deter Mr. Allen from re-offending or to promote respect for the law.  Indeed, to send him to

prison *now*,  nearly 12 months after his arrest and pretrial release, and after he has done

everything he possibly could to attempt to rectify this situation, including acceptance of full

responsibility, pleading guilty, and providing assistance to two separate Government

---

[5]  See also Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (citing research finding that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects").

investigations, would send precisely the wrong message.   Where a defendant, like Mr. Allen, has

reformed his conduct and has been subject to, and complied with, the restrictions of pretrial

release, a sentence of imprisonment "may work to promote not respect, but derision, of the law if

the law is viewed as merely a means to dispense harsh punishment without taking into account

the real conduct in circumstances involved in sentencing."   Gall, 128 S.Ct. at 599.   Mr. Allen

submits that the penalties and the pretrial release restrictions which he has already experienced

have sent a clear message to others of the consequences of committing insider trading.

 Imprisonment also is not necessary to protect the public from future crimes by Mr. Allen

because there is **no** likelihood that Mr. Allen will recidivate.  Mr. Allen is 46 years old, has not

had any prior convictions, is a college graduate, has been employed his entire adult life, has no

history of alcohol or drug abuse, and is married with two young children.  For all male offenders

in Criminal History Category I, the recidivism rate is only 15.2%.  See U.S. Sent'g Comm'n,

Measuring Recidivism: The Criminal History Computation of the Federal Sentencing

Guidelines, Exh. 9, at 28 (May 2004).  This rate goes down to 6.9% where the offender is 41-50

years old; to 7.1% where the offender is a college graduate; to 12.7% where the offender has

been employed; to 9.8% for offenders who have ever been married; and to 10.8% where the

offender has no history of illicit drug use.  Id., Exh. 9; id., Exh. 10 at 29.  Finally, where the

Criminal History Category I offender is convicted of fraud, the rate of recidivism is only 9.3%.

Id., Exh. 11 at 30.  Certainly, offenders like Mr. Allen, who meet all of the above criteria, would

have the lowest possible rate of recidivism.  We respectfully urge the Court, in determining a

sentence that is sufficient but not greater than necessary to protect the public from future crimes

of Mr. Allen, to take into consideration the statistically very low risk of recidivism presented by

Mr. Allen's history and characteristics.   See, e.g., United States v. Apodaca, 641 F.3d 1077,

1080 (9th Cir. 2011) (affirming downward departure where defendant presented low risk of

recidivism); United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (finding

"concerns about recidivism … compel[led] a sentence still substantially less than 37-46 months"

recommended by the Sentencing Guidelines where defendant, like Mr. Allen, had zero criminal

history points).

Notwithstanding this offense, Mr. Allen has led an honest and respectable life, marked by

steady employment, a stable family life, and active participation in his community.  His conduct

in this case can only be described as truly aberrant.  His actions since his Indictment also

demonstrate that he is fully deterred from future violation of the law.  As discussed, while under

the restrictions of supervised release in this case, Mr. Allen obtained employment at Brightlink

and promptly reported his discovery of suspected criminal conduct on the part of the company's

CFO to the FBI.  His substantial assistance in that investigation, as well as his cooperation with

the AUSA in this case, provides confirmation that Mr. Allen is both deterred from violating the

law and that the public requires no protection from Mr. Allen.

Given Mr. Allen's lack of any criminal history, otherwise unblemished professional

record, and cooperation with the Government, there is simply no reason to believe that Mr. Allen

will engage in future criminal conduct.  Not only does his history show how anomalous his

behavior in this case was, but as a convicted felon, Mr. Allen will never be in a position to obtain

material non-public information again.  In sum, this Court can rest assured that this was an

isolated incident that is not exhibitive of Mr. Allen's overall character; that Mr. Allen is deeply

remorseful for his actions; and that Mr. Allen will never commit another offense.  A term of imprisonment in this case is simply unnecessary to satisfy the ends of justice.

**C.     A Guidelines Sentence Would Create Unwarranted Disparities in Sentences Imposed on Similarly Situated Defendants Guilty of Similar Conduct**

Section 3553(6) provides that sentencing courts "*shall* consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(6) (emphasis added).  In fashioning a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing, this Court must therefore take into consideration that other defendants with similar records who have been found guilty of conduct similar have received sentences substantially below the recommended Guidelines ranges.

Indeed, below-Guidelines sentences are quite common, with avoidance of unwarranted sentencing disparities often used to justify, at least in part, downward variances.  See, e.g., U.S. Sentencing Comm'n Annual Report FY 2011, Sourcebook Table N-2, *available at* *http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2011/TableN-2.pdf* (showing that 60% of all sentences imposed in this Circuit in 2011 were below the recommended Guidelines range); id. at Tables 25A and 25B (showing "[a]void[ing] unwarranted sentencing disparity among defendants" cited as reason for imposing below-Guidelines sentence or downward departure 2,927 times).  In the Southern District alone, over half (64%) of all sentences imposed in 2011 were below the Guidelines range.  Id. at Appendix B, New York, Southern, *available at* *http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_*

*Sourcebooks/2011/Stats_NYS.pdf.*[6]  Defendants in fraud cases were sentenced below the

Guidelines range, either as a result of a downward departure or a § 3553 variance, in 3,409 cases,

id. at Table 27, and those sentenced under § 2B1.1 in particular received a below-Guidelines

sentence in 3,668 cases, id. at Table 28.  Of the 27 defendants who were sentenced under §

2B1.4 for insider trading, 21 (or >77%) received a downward departure or a non-Guidelines

sentence.  Id.

       Courts in this district consistently have imposed below-Guidelines sentences in cases that

are strikingly similar to this one.  For example, in United States v. Santarlas, Case No. 1:09-cr-

1170, the defendant pleaded guilty to a two-count information charging him with conspiracy to

commit securities fraud and substantive securities fraud.  Like Allen, the Defendant had, as a

result of his employment at a law firm, obtained material, non-public information regarding the

impending acquisition of two companies by two of his firm's clients.  Unlike Allen, however, he

himself executed securities trades in these companies based on this inside information, and

shared the information with others, who also executed securities trades in the two companies.

Although Defendant's advisory Guidelines range was 30-37 months, he received only a six

month sentence.  In United States v. Benhamou, Case No. 1:11-cr-00336 (2011), the defendant

tipper pleaded guilty to one count of conspiracy to commit securities fraud, one count of

securities fraud, one count of conspiracy to obstruct justice, and one count of making false

statements.  His recommended Guidelines range was 108 to 135 months' imprisonment, based

primarily on a loss amount of between $20 and $50 million.  Defendant was sentenced to time

served (24 days), plus three years supervised release.

---

[6]  This includes both downward variances under 18 U.S.C. § 3553(a) and Government and
nongovernment-sponsored downward departures.

Like Allen, Santarlas and Benhamou both had cooperated with the Government, which accounted in large part for their below-Guidelines sentences.  However, even non-cooperating, insider trading defendants who are sentenced in this District frequently receive sentences below the applicable Guidelines range.  Several cases are instructive.

In United States v. Nguyen, et al., Case No. 1:11-cr-00032 (2011), the defendant, James Fleishman, who worked at an expert networking firm, was charged with conspiracy to commit securities fraud and conspiracy to commit wire fraud after trading on, and disclosing to others who traded on, material non-public information he obtained through his employer.  He did not cooperate and instead insisted on going to trial, which resulted in guilty verdicts. At sentencing, Fleishman faced a Guidelines range of 87-108 months, which was largely based upon a loss amount of $3.7 million.  Fleishman was sentenced 30 months, nearly 5 years less that the low-end of the indicated range, plus two years of supervised release.

In United States v. Bowers, Case No. 1:09-cr-00496, the defendant, who worked for an investment bank, received inside information from his wife, an employee at a communications firm, regarding the acquisition of another company by one of the firm's clients and the acquisition by another company of one of the firm's clients.  Bowers then provided this inside information to a client of his, who traded in the securities of the soon-to-be-acquired companies. Bowers' co-defendants, many of whom traded over and over again on this information, realized huge profits, some in excess of $2.1 million.  Like Allen, however, Bowers did not trade on nor directly profit from his client's trades, although he did, like Allen, receive a modest amount, $12,000, as a result of his offense.[7]  Bowers was sentenced to only three years' probation.

---

[7] See Case No. 1:09-cr-00496, Doc. 18 at 38.

21

In United States v. Okada, 1:07-cr-00144, the defendant pleaded guilty to one count of conspiracy to commit securities fraud and one count of substantive securities fraud.  Although his sentencing Guidelines range was 30-37 months, he received a non-custodial sentence of three years' probation.

In United States v. Gansman, Case No. 1:08-cr-00471, the defendant was convicted by a jury of six counts of securities fraud.  He initially faced 41-51 months' imprisonment, but his range was lowered to 33-41 months after the sentencing judge found that the two-level enhancement under U.S.S.G. § 3B1.3 was inapplicable.   He was sentenced to a total term of one year and one day imprisonment, followed by six months' supervised release.

In United States v. Peterson, Case No. 1:11-cr-00665, the defendant, who served on the board of Mariner Energy, Inc., which was about to be acquired by another company, breached his fiduciary duty and tipped the inside to his son, who then executed securities in Mariner based on this information.  The defendant's son also disclosed the inside information to his friend, Drew Brownstein, the CEO of an asset management company, who then purchased call options on Mariner stock.  See United States v. Brownstein, Case No. 1:11-cr-00904.  Peterson pleaded guilty to one count of conspiracy to commit securities fraud and one count of securities fraud in violation of 18 U.S.C. §§ 371 and 2, and 15 U.S.C. §§ 78j(b) and 78ff.   The Court sentenced Peterson to two years' probation, with three months to be served in home confinement.  This below-Guidelines sentence was based in part on Peterson's lack of any criminal history.  For his part, Brownstein, who realized substantial gains, personally pocketing approximately $2.4 million from trading on the inside information, pleaded guilty to one count of securities fraud

and faced a Guidelines range of 37-46 months' imprisonment.  He was sentenced to one year and one day of imprisonment, far below the indicated range.

Finally, in United States v. Moffat, Case No. 1:10-cr-00270, a case over which Your Honor presided, the defendant, a former executive at IBM, pleaded guilty to conduct nearly identical to that of Mr. Allen.  Like Mr. Allen, he was a tipper who provided inside information to a friend, and pleaded guilty to conspiracy to commit securities fraud and securities fraud. Moffat received a total term of six months' imprisonment.  Although Bennett, and to a much lesser degree, Mr. Allen, profited from the trades Bennett made, the fact that Allen and Bennett realized a gain as a result of their conduct, and Moffat did not, does not render Mr. Allen's *conduct* dissimilar to Moffat's.   Section 3553(a)(6) requires this Court to compare defendants who engaged in "similar conduct."  Considering the defendants' conduct, Mr. Allen and Moffat behaved identically.  The only difference between this case and Moffat is that in this case there is a discernible "loss amount," which bears no relation to the actual conduct – tipping a friend with inside information – committed by the defendants and to be punished in both cases.[8]   It just so happens that, due to the volatility of the stock market – which is wholly unrelated to one's conduct and culpability –Bennett actually profited from his trades while Moffat did not.  More, Moffat did not have the considerable mitigating factors in his favor as demonstrated by Mr. Allen in this case warranting a substantial variance from the guidelines.

---

[8] See also United States v. Collotta, Case No. 1:07-cr-00143 (defendant with 12-18 month Guidelines range sentenced to 60 days imprisonment and 6 months home confinement); United States v. Goehring, Case No. 1:05-cr-00209 (defendant with 10-16 month Guidelines range sentenced to 2 years' probation and 5 months' home detention; United States v. Holzer, Case No. 1:09-cr-00470 (defendant with 12-18 month Guidelines range sentenced to 5 years' probation); United States v. Koulouroudis, Case No. 1:09-cr-00440 (defendant with 18-24 month Guidelines range sentenced to 3 months' imprisonment and 3 months' home confinement); United States v. Paparrizos, Case No. 1:09-cr-00400 (defendant with 6-12 month Guidelines range sentenced to 3 years' probation and 6 months' home confinement).

The above makes clear that in these types of insider trading cases, Guidelines sentences, which are driven almost entirely by the "loss amount" rather than the defendant's actual conduct or intent, are almost anomalous.  While some of the defendants in the above-described cases were facing lower ranges due to lower loss amounts, this is a distinction without a real difference and should not alter this Court's unwarranted sentence disparity analysis since *that* analysis should be driven by the *conduct* of the defendant and his or her comparators.  In this case, a Guidelines sentence not only would overstate the seriousness of Mr. Allen's offense, but would be disproportionately and disparately greater than sentences imposed in other similar insider trading cases in this jurisdiction, and would thus run afoul of section 3553(6)'s mandate that unwarranted sentencing disparities be avoided.

IV.     **CONCLUSION**

For the foregoing reasons, Mr. Allen respectfully submits that a sentence of community confinement or home detention for a meaningful term of months would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted this 15th day of August, 2012.


*/s/ Brian F. McEvoy*___
Brian F. McEvoy
Georgia Bar No. 490845
Attorney for Scott Allen


CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
3127 Maple Drive, N.E.
Atlanta, Georgia  30305
(404) 233-4171
bfm@cclblaw.com

24

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed a copy of the foregoing DEFENDANT SCOTT ALLEN'S MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE ON BEHALF OF THE DEFENDANT SCOTT ALLEN with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following:

> Marissa Bea Molé, Esq.
> Michael A. Levy, Esq.
> United States Attorney's Office, SDNY
> One Saint Andrew's Plaza
> New York, New York 10007
> *marissa.mole@usdoj.gov*
> *michael.levy@usdoj.gov*

This 15th day of August, 2012.

> */s/ Brian F. McEvoy*
> Brian F. McEvoy
> Georgia Bar No. 490845
> Attorney for Defendant, Scott Allen

CHILIVIS, COCHRAN, LARKINS & BEVER, LLP
3127 Maple Drive, N.E.
Atlanta, Georgia 30305
(404) 233-4171
(404) 261-2842 (Fax)
*bfm@cclblaw.com*