UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

UNITED STATES OF AMERICA        :

   - v. -                                 :      11 Cr. 997 (DAB)

SCOTT ALLEN,                         :

           Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM


                                      PREET BHARARA
                                      United States Attorney for the Southern
                                      District of New York

RICHARD C. TARLOWE
MICHAEL LEVY
MARISSA MOLÉ BOSTICK
Assistant United States Attorneys

   - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of Scott Allen.  Allen was a central participant in an insider trading scheme in which he betrayed the trust of his employer and its clients in order to enrich himself and his close friend to the tune of more than $1 million.  Specifically, in his capacity as a principal of a human resources consulting firm, Allen learned material, nonpublic information relating to unannounced takeovers of publicly-traded companies.  Allen disregarded his obligation to keep that information confidential and, in exchange for substantial cash payments, disclosed information about two of those takeovers to his longtime friend, John Bennett, so that Bennett could execute securities transactions on the basis of that inside information.  Bennett used the inside information provided by Allen to earn more than $1 million in illegal trading profits, and Allen, in turn, received cash payments from Bennett totaling more than $100,000.  As set forth below, the Government submits that in light of the seriousness of the conduct and the need for just punishment and general deterrence, a sentence within the Guidelines range of 46-57 months is warranted.

**I.    ALLEN'S CRIMINAL CONDUCT**

   **A.    Allen's Illegal Tips**

Allen was a principal at a human resources consulting firm in Atlanta, Georgia (the "Consulting Firm").  In that role, Allen was privy to material, nonpublic information about unannounced takeovers of publicly-traded companies.  In February 2008 and April 2009, Allen tipped Bennett about two such takeovers so that he and Bennett could profit from the illegal use of that information.

   1.    <u>Millennium Pharmaceuticals</u>

In or about February 2008, the Consulting Firm was hired in connection with an acquisition of Millennium Pharmaceuticals, Inc. ("Millennium"), a publicly-traded bio-

pharmaceutical company, and Allen learned of the acquisition as part of his work for the Consulting Firm. Allen disclosed material, nonpublic information concerning the planned takeover of Millennium to Bennett so that Bennett could execute securities transactions on the basis of that information. Bennett purchased a number of Millennium call option contracts at a total cost of approximately $17,000. On or about April 10, 2008, the acquisition of Millennium was publicly announced, causing the stock price to increase by approximately 50%. Following that announcement, Bennett sold the Millennium options for a profit of approximately $602,000. Shortly thereafter, as described more fully below, Bennett began making cash payments to Allen.

        2.      <u>Sepracor, Inc.</u>

In or about April 2009, the Consulting Firm was hired in connection with an acquisition of Sepracor, Inc. ("Sepracor"), a publicly-traded specialty pharmaceutical company, and Allen learned of the takeover as part of his work for the Consulting Firm. Allen disclosed material, nonpublic information concerning the planned takeover of Sepracor to Bennett so that Bennett could execute securities transactions on the basis of that information. Bennett executed various transactions in Millennium options. On or about September 3, 2009, the acquisition of Sepracor was publicly announced and the stock price rose by more than 25%. By trading Sepracor securities ahead of that announcement, Bennett generated illegal profits of approximately $516,000.

    **B.**    **Allen's Receipt of Cash Payments**

In or about April 2008, shortly after the Millennium takeover was publicly announced, Bennett began sharing with Allen the proceeds of their illegal insider trading scheme. The two met in person in New York on more than 20 separate occasions – from April 2008 through the

summer of 2010 – for Bennett to make cash payments to Allen.  Allen typically received around $5,000 in cash at a time, which Bennett frequently withdrew from the bank shortly before their meetings.  In total, Allen received more than $100,000 in cash in exchange for the illegal tips.

### C. Allen's Efforts to Conceal The Scheme

Recognizing that his conduct not only violated his employer's rules of confidentiality, but also violated the law, Allen actively sought to conceal his illegal scheme and avoid detection by law enforcement.  When Allen began tipping Bennett in 2008, the two had already been friends for a number of years and had been communicating regularly using phones that were in their names and thus easily traceable to them.  After the scheme began, however, in order to create the false impression that they no longer were in contact, Allen and Bennett ceased communicating with each other on phones that were traceable to them.  Thus, they used pay phones and arranged to meet in person; when Allen flew from Atlanta to New York, he often used a phone at the Delta Sky Lounge at LaGuardia Airport – rather than his cell phone – to contact Bennett and arrange such meetings.  And it was at those meetings that Allen received the cash payments from Bennett.  In a further effort to conceal evidence of their ongoing relationship, Allen omitted reference to Bennett's name in entries in his electronic calendar reflecting those meetings.  Instead, Allen typically referred only to the name of the restaurant where they were meeting.

By concealing evidence of their ongoing relationship, Allen and Bennett hoped to avoid detection by law enforcement.  And when the Government did detect their insider trading activities, Allen again tried to throw investigators off the scent, believing that his prior efforts at concealment would substantiate his false denials.  In October 2010, Allen was approached by FBI agents at his home in Georgia.  Allen falsely claimed that he had not seen or talked to Bennett in

3

several years; in truth, however, he and Bennett not only had been speaking regularly, but had been meeting repeatedly for Allen to receive his cut of the illegal proceeds. When asked about the two stocks at issue - Sepracor and Millennium – Allen claimed that although Millennium sounded familiar, he could not recall whether he had worked on that deal, and that he was not sure whether he had worked on the Sepracor deal either. Obviously Allen knew that these were the companies about which he had tipped Bennett.

## II.  A GUIDELINES SENTENCE IS WARRANTED

There is no dispute that, as set forth in the Presentence Report, the applicable Guidelines range is 46-57 months' imprisonment. The Government submits that a sentence within that range is appropriate in light of, among other things, the seriousness of Allen's conduct and the need for just punishment and general deterrence.

Allen contends that the Guidelines overstate the seriousness of the offense and essentially asks the Court to dispense with the Guidelines. But even though the Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). Ironically, in his sentencing submission, Allen emphasizes the need to avoid unwarranted sentencing disparities, but asks the Court to largely ignore the Guidelines, which are themselves intended to avoid such disparities. *See Gall* v. *United States*, 552 U.S. 38, 54 (2007) (the "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."); *United States* v. *Wills*, 476 F.3d 103, 110 (2d Cir. 2007)

("We think the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest."). Moreover, the Court, of course, "must consult those Guidelines and take them into account when sentencing." *Booker*, 543 U.S. at 264.

Allen contends, however, that because the Guidelines are based in large part on the gain amount, they overstate the seriousness of the conduct. Here, the gains realized by Bennett were directly attributable to the inside information that Allen provided to him, and Allen provided that information understanding not only that Bennett would trade on it, but that the information was extremely valuable because it related to takeovers that would surely move the stock price on announcement. Moreover, whether or not he had specific knowledge of the precise profits generated by Bennett's trades, Allen had to appreciate – at a minimum – the general magnitude of those profits given that Allen himself received over $100,000 from Bennett. Moreover, the Guidelines appropriately take into account Allen's abuse of a position of trust. *See* U.S.S.G. § 3B1.3. At the same time, there are aggravating factors present here that the Guidelines do *not* take into account – such as the existence of more than one illegal tip, Allen's receipt of more than $100,000, and the length of time during which the scheme continued. Furthermore, Allen contends that there are no discernible victims (Allen Sent. Mem. at 4), but overlooks that in addition to the impact on the overall market, the Consulting Firm is a direct, identifiable victim of Allen's crime; that factor also is not accounted for by the Guidelines. Thus, Allen's claim that the Guidelines overstate the seriousness of his conduct is unfounded.

Moreover, Allen also minimizes or overlooks other aspects of his conduct that militate in favor of a Guidelines sentence. Importantly, his conduct did not consist of an isolated occurrence,

5

nor was it a "momentary [] lapse in judgment" as Allen curiously contends. (Allen Sent. Mem. at 15). On the contrary, Allen's illegal conduct was repeated, and spanned a period of more than two years – Allen's initial tip was in February 2008; his second tip came more than a year later, in May 2009; and Allen continued to receive substantial cash payments from Bennett through the summer of 2010. Throughout that period, despite repeatedly meeting in person with Bennett to receive those cash payments, Allen persisted in his efforts to conceal his relationship with Bennett. And when approached by the FBI in October 2010 and questioned about his relationship with Bennett, Allen clung to a false cover story.

Allen's claim that his conduct was motivated not by greed, but by a misguided desire to help a friend in need, is dubious given that Allen personally received more than $100,000 in cash from Bennett. And even after Bennett made more than $500,000 on the first tip, Allen chose to provide a second illegal tip to Bennett to generate additional illegal profits. Similarly, Allen's claim of genuine remorse rings hollow given the choices he made after the commission of the underlying crime. As indicated, Allen continued to receive cash payments through the summer of 2010; when confronted by the FBI in October 2010, he made false statements; and after he was charged, Allen chose to plead guilty just weeks before trial and only when he learned that Bennett had agreed to testify against him.

Allen also contends that a Guidelines sentence would create an unwarranted sentencing disparity. As an initial matter, the need to avoid unwarranted sentencing disparities *nationwide* is just one of the factors to be considered under Section 3553(a). "Precisely because § 3553(a)(6) is only one of several factors that must be weighted and balanced by the sentencing judge, a district court's identification of disparity does not necessarily require it to adjust a sentence downward

from the advisory guidelines range in order for that sentence to be reasonable." *United States* v. *Florez*, 447 F.3d 145, 157-58 (2d Cir. 2006) (internal quotation marks and citations omitted); *see also Wills*, 476 F.3d at 110 ("We think the mandate to take into account nationwide disparities under § 3553(a)(6), as distinct from the need to give due weight to the Guidelines under § 3553(a)(4), is modest."). But more importantly, a Guidelines sentence would not create any *unwarranted* sentencing disparity. In support of his contention, Allen arbitrarily selects certain other insider trading sentences in this District, but those cases are of little value, as they include both cooperating and non-cooperating defendants, defendants who pleaded guilty and defendants who were convicted after trial, and defendants who engaged in widely varying conduct. In some instances, Allen overlooks crucial distinctions that make clear he is by no means *similarly* situated to the particular defendant whose sentence he cites.

  For example, Allen's assertion that he is "strikingly similar" to Brien Santarlas is absurd. Indeed, the contrast between the two could hardly be more striking. Santarlas, like Allen, was approached by agents of the FBI before he or any of his coconspirators had been charged. But unlike Allen, Santarlas immediately admitted his conduct and agreed to cooperate with the FBI. In fact, the very same day that he was approached by the FBI, Santarlas made a consensual recording with a co-conspirator, Arthur Cutillo, that resulted in important evidence against Cutillo. (Allen omits to mention that Cutillo, a non-cooperating co-conspirator of Santarlas whose conduct was virtually identical to that of Santarlas, pled guilty in that case and received a sentence of 30 months' imprisonment). Santarlas also provided crucial trial testimony at the trial of three other defendants in the case of *United States v. Goffer*. In contrast, when Allen was approached by the FBI, he made false statements. And even after being charged, Allen decided to

plead guilty just weeks before trial and only after learning that Bennett had agreed to testify against him. In addition, Santarlas made a total of $32,500 from his crime, while Allen made more than $100,000.[1]

Furthermore, Allen's claims of "cooperation" are greatly exaggerated. As indicated, Allen admitted his conduct for the first time just weeks before his trial was scheduled to begin and only after he learned that Bennett would be testifying against him. Allen's "cooperation" - all of which occurred after he pled guilty - falls into two categories: (1) information he provided about potential fraud against a company for which he now works, and (2) information he provided about an individual to whom Bennett passed Allen's inside information.

As to the former, Allen learned information in the course of his current employment that he believed evidenced an embezzlement scheme by a former employee of the company. Thus, Allen believed that his employer had been the *victim* of a fraud. Although it is commendable that Allen (while awaiting sentencing in this case) brought that information to the attention of the FBI, doing so is hardly comparable to the type of cooperation provided by people like Santarlas or other cooperating witnesses. With respect to the other category of information, after pleading guilty, Allen requested an opportunity to meet with the Government to provide information about an individual to whom Bennett had passed Allen's tips and who, like Bennett, traded on that information. The Government was aware of that individual and advised Allen's lawyer that, in its view, such a meeting would be unlikely to lead to any new charges. Allen's information did not lead to any new charges; however, Allen provided certain information suggesting that Bennett had not been completely truthful in his meetings with the Government about passing Allen's tip to

---

[1] Santarlas did not, as Allen contends, trade on the inside information.

Bennett's friend and business associate. Following the Government's meeting with Allen, and based on information provided by Allen, the Government questioned Bennett again, at which time Bennett admitted that, contrary to what he had previously told the Government, he had in fact passed Allen's tip on to his friend and business associate. The Government does not dispute that the Court can and should take this into account in fashioning an appropriate sentence; but Allen greatly overstates its significance, and it does not even come close to warranting the type of variance Allen suggests.

Finally, the need for general deterrence also weighs in favor of a Guidelines sentence in this case. Insider trading is a crime that, as demonstrated by the facts of this case, can be incredibly lucrative and is difficult both to detect and to prosecute. Indeed, although the Government ultimately was able to piece together the evidence of this scheme by meticulously reviewing and analyzing, among other things, MetroCard records (showing Allen and Bennett at the same subway station at the same time) and flight records (placing Allen at LaGuardia Airport at the time of calls to Bennett from a phone at the Delta Sky Lounge), this case highlights some of the difficulties of prosecuting this type of crime. Because people who find themselves faced with the choice that Allen made when he embarked on this criminal course recognize that insider trading is (A) potentially very profitable and (B) hard to detect and prosecute, it is important that the calculus also include an understanding that, if caught, those committing this offense will be prosecuted and sent to prison. *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

9

**CONCLUSION**

For the reasons explained above, a sentence within the applicable Guidelines range of 46-57 months' imprisonment is appropriate.

Dated: New York, New York
September 12, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:   /s/ Richard C. Tarlowe
Richard C. Tarlowe
Michael Levy
Marissa Molé Bostock
Assistant United States Attorneys